## Fort Chartres and Ivy Landing Drainage and Levee District Number Five v. Alphonse Smalkand.

1. VERDICTS—*Against the Weight of the Evidence.*—The verdict in this case is clearly against the weight of the evidence, and the judgment rendered in pursuance thereof must be reversed.

2. DRAINAGE DISTRICTS—*Power of Commissioners.*—The commissioners of a drainage district have limited and special powers which they can only exercise in accordance with the drainage act.

3. SAME—*Assessments.*—Before an assessment can be made on land comprising a drainage district, the commissioners must determine the probable cost of the proposed work, and present to the court that appointed them a petition setting up their conclusions, together with plans, specifications, etc., when a hearing on notice must be had.

4. SAME—*Power to Contract.*—Sections 28 and 36 of the drainage act are to be construed in connection with the preceding sections; they do not modify the preceding restrictions upon the power to contract, but only grant the power to contract in subordination to such restrictions.

Assumpsit, on the common counts. Error to the Circuit Court of Monroe County; the Hon. BENJAMIN R. BURROUGHS, Judge, presiding. Heard in this court at the February term, 1897. Reversed without remanding. Opinion filed June 10, 1897.

CHARLES MORRISON and TRAVOUS & WARNOCK, attorneys for appellant.

SLATE, BOLLINGER & WINKLEMAN, attorneys for appellee.

MR. PRESIDING JUSTICE SAMPLE DELIVERED THE OPINION OF THE COURT.

The plaintiff in error had a contract with the firm of Schilling & Hank to make some large ditches with a dredge, to cost several thousand dollars. It required a large quantity of water to float the dredge boat, and in order to obtain it Schilling shut down a flood-gate at the mouth of "Mill Race Ditch," without the consent of the commissioners. High waters came, overflowed the lock, and damaged the foundation. Schilling attempted to open the gate, but, on account of the pressure of the water, or for some other cause, it could not be raised, and thereafter, in the night time, it was blown up by dynamite, by whom, the evidence does not disclose. The firm agreed to restore the gate and lock to its former condition, and for this purpose they entered into a written contract with the defendant in error, drawn up by one of the drainage commissioners, and signed by the parties—the firm and defendant in error—November 12, 1892, which is too long to set out here. The effect of the contract was, first, that the work was to be done under the supervision of the commissioners, or their superintendent; second, that for certain specified work defendant in error was to receive the sum of $975; third, he was, further, "to put in or under or about such lock a good and sufficient concrete * * * and rock * * * about said lock as said commissioners may require to put said lock in as good condition, in their judgment, as it was before the high water of 1892," and for such concrete work was to receive $6.50 per cubic yard, and was to receive a reasonable price for all the work. Then the kind of material to be used is described and how to be prepared, which was to be subject to the inspection of the commissioners. Fourth, "And said contractor shall be allowed a reasonable price for all extra work not above specified; that is to say, for the extra work of pumping water * * * for bridge work * * * and for repairing the concrete foundation under the pillars or abutments, as the case may be; or for any other extra work said contractor may do or cause to be done under or about

said lock." The commissioners had paid Schilling & Hank over $1,000 for work on the ditches, and held back about $2,800 until they repaired the lock. It appears that at the time the above contract was made it could not be definitely determined what the condition of the injured lock was, on account of the water, but when that was pumped out, the foundation was found to be so injured that piling had to be driven and a concrete foundation made on them, and also it was determined to deepen the foundation at one part some two feet. As Schilling could not be present, he requested Mr. Hardy, one of the commissioners, to look after his interests. The defendant in error began work under his contract with Schilling & Hank, but claims it was soon interrupted by changes made by verbal direction of Hardy, especially as to the piling, which was not specifically mentioned in the contract. He requested a written order, as to the piling, from the commissioners. Thereupon the commissioners entered of record an order, of which a copy was given him, to do said piling so as to make the necessary foundation "for the new piers to be built by Alphonse Smalkand, under his contract with Schilling & Hank, * * * to repair said lock." He also claims that the deepening of the foundation some two feet was extra and outside the contract. The items, as presented on his bill for extra work, outside of the contract, were $947.70 for concrete, $423.50 for masonry, $34 for extra work on rip-rap, and $650.50 for piling, and some other items, making a total of $2,915.50. He also did the specified work in the contract, amounting to $975, which was paid, making a total of work $3,890.50. On what he calls extra work, he received from the district $2,000 in bonds, which were discounted $200, which, as he says, the district was to bear, leaving a net payment on the whole extra work of $1,800, making still due him $1,115.50. The payments made by the commissioners were made under a written order of Schilling, of date December 20, 1892, on the commissioners, to pay Smalkand in "bonds of the district, on account of repairing the Mill Race Lock, in such

amount as said board of commissioners may deem safe and proper on such work, and at such time as they may consider proper, on my account." Under this order the commissioners paid to Smalkand $3,000 in bonds for this work, which was more than the balance owing to Schilling & Hank under the original ditch contract. Therefore the commissioners refused to pay Smalkand any more bonds, claiming his contract was with Schilling & Hank, and not with them. Hence this suit.

There is no claim that the commissioners made a contract with Smalkand, and the fact is, no contract was made by them. The claim is that Hardy, one of the commissioners, ordered certain work to be done, which is called extra, and that he, and another commissioner, verbally stated the district would pay for it. The commissioners claim all the work was done under the contract and that they never promised, verbally or otherwise, to pay for any of it, except to the extent of the balance due Schilling & Hank.

Smalkand obtained a judgment for $1,099.50. The principal contentions are that the judgment is not supported by the evidence; that the verdict on which it is based was obtained by erroneous instructions, which misled the jury; that under the law the commissioners had no legal right to create such a debt in the manner in which it is claimed this alleged debt was created.

The record has been carefully examined, and without going into an extensive analysis of the evidence in this opinion, suffice it to say that all the work done by Smalkand was under the contract he had with Schilling & Hank, except possibly deepening a part of the foundation, which it is said, owing to the customary way of measuring such work, did not add to the cost. The terms of the contract between Schilling & Hank and Smalkand show that the concrete and masonry work was included, and when the water was pumped out, the conditions disclosed showed that it was necessary to drive piling to make a foundation for the concrete. The written order of the commissioners was notice to Smalkand that he was doing that piling work

under the contract. The contract by its terms covers all extra work necessary to place the lock in its former condition, which was destroyed substantially by Schilling & Hank. All such work, which Smalkand calls extra, is as clearly covered by the contract as the specified work, amounting to $975. The reason that amount was specified was that it was above the water at that time, while much of the other work was not, and therefore could not be specifically agreed upon.

There is no evidence that the commissioners ever, at a meeting or otherwise, agreed to make such repairs at their expense, or had a contract with Smalkand to do the work. The contract referred to sufficiently shows that the district was not to pay for repairing the lock. We are unable to find a basis for Smalkand's claim against the district on the facts.

In addition to this conclusion, if the facts were that the commissioners had made a verbal contract with Smalkand to do the work, there could not, in law, have been a recovery, under the authority of Badger et al. v. Inlet Drainage District, 141 Ill. 540. In that case the district was organized and the assessments made and confirmed in November, 1879. Afterward, on June 1, 1882, the commissioners made a contract with the firm of H. E. Badger & Son, whereby their dam across Inlet Creek, with the mason work, etc., were to be removed by said firm for the sum of $1,700, and to pay the same the commissioners made an assessment on the land and also issued seventeen orders for $100 each, and delivered the same to the firm. In that case it was held there could be no recovery, for the reason that the commissioners had limited and special powers which they could only exercise in accordance with the drainage act; that by Sec. 9 of the said act, the commissioners shall first determine the probable cost of such work; by Sec. 11, they shall present to the court that appointed them a petition setting up their conclusions, together with plans, specifications, etc., when a hearing or notice should be given.

It is said: " The statute will be searched in vain for

authority for the commissioners to do any act materially affecting the character, extent or cost of the improvement, as to which there is not provided that there shall be notice to the land owners affected, and opportunity for them to be heard." It is further held that the power to contract and be contracted with, given by Sec. 28, is in subordination to the restriction mentioned, and the same is held to be true of Sec. 36, which gives the commissioners power to "do any and all acts that may be necessary in and about the surveying, laying out, constructing, repairing, altering * * and maintaining any drain, ditch, levee or other work for which they shall have been appointed, including all necessary bridges, * * * dams, side drains, etc., any may use any money in their hands arising from assessments for that purpose." It is also said, "it is still further manifest that this section (36) is but an additional limitation or restriction and not an enlargement of the powers intended to be conferred by Sec. 28, by the provisions which follow the language quoted, regarding public lettings in certain cases, to the lowest bidder," etc.

Reference is also made to the restrictions imposed by Sec. 37, of the amendatory act of 1885, Starr & Curtis, Vol. 3, p. 422, which, as will be observed, gives the commissioners power to use the money raised by assessment "for the purpose of constructing or repairing * * * any ditch, * * levee, etc., * * * within such district. Provided that the commissioners shall use such money under the direction and approval of the court;" and that assessments may be made "when it shall appear to the court" to be necessary "for the maintenance and repair" of such work. This section further provides, as by Sec. 9 of the original act, that the commissioners shall present the matter by petition to the court with estimates, specifications, etc., upon which, after notice, a hearing shall be given. It will be observed the law applies to repairs, at least where $500 expenditure is involved, if not to less amounts, as well as to construction, so far as petition, notice and hearing is concerned. In fact, amendatory Sec. 37 seems to require the

approval of the court as to the expenditure of all sums for repair or construction. It is evident the legislature intended to surround the fund raised with safeguards to prevent its loss, and, as indicated by the Badger case, the courts are not inclined to allow any laxity in the creation of debts by the commissioners.

Counsel for defendant in error are mistaken in the position that the law allows commissioners to make repairs for an unlimited amount. The restrictions, as shown by the statute above quoted, are the same as to repairs as to the construction, so far as the claimed liability in this case is concerned. In the Badger case it is also held that the doctrine of estoppel will not apply where the statute is not followed in the creation of the debt.

For these reasons the judgment is reversed and not remanded.